IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-10-788-4 |
| | § | CIVIL ACTION NO. H-14-721 |
| KENNETH RAY RANDLE, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Kenneth Ray Randle's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 244),[1] and Memorandum in Support (Document No. 246, the United States's Answer and Motion to Dismiss Movant's § 2255 Motion (Document No. 267), and Movant's Response to the Government's Motion to Dismiss (Document No. 267).   After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 267) be GRANTED, and that Movant Kenneth Ray Randle's § 2255 Motion (Document No. 244) be DENIED.

## I.    Procedural History

Movant Kenneth Ray Randle ("Randle"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255.  This is Randle's

---

[1] Kenneth Ray Randle's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-14-721 and at Document No. 244 in Criminal Action No. H-10-788.

first attempt at § 2255 relief.

On November 10, 2010, Randle along with Michael Anthony Wilbourn, Ronald Dwayne Thomas, and Michael James Washington were charged by Indictment with aiding and abetting armed bank robbery in violation of 18 U.S.C. §§ 2113(a) & (d), 2 (Count 1), and aiding and abetting the brandishing of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Count 2) (Document No. 27).  On April 1, 2011, Randle pleaded guilty to Count One without a written plea agreement.  (Document No. 70, Transcript of Rearraignment, Document No. 173).  The transcript of Randle's Rearraignment shows that he understood the charges against him, the rights he would give up if he pleaded guilty, the possible penalties, and the sentencing process. (Document No.173, p.13-23).  The record further reflects that the Government summarized what it was prepared to prove if the case proceeded to trial. (Document No. 173, p. 25-32). The Prosecutor stated:

> First, the Government would be prepared to prove if the case went to trial, that the young man to my left in the orange pants and white shirt, is the same Michael Wilbourn as is named in the Indictment.  And the young man in the orange pants and orange shirt is the same Ronald Thomas named in the Indictment.  And the young man in the green suit is the same Kenneth Randle as named in the Indictment.

> All the Government's evidence, documents, witness statements and defendant statements would be admissible at trial without objection.

> But more specifically, that on Thursday, October 14th of 2010, at about 9:45 a.m., the First National Bank located in the 5800 block of South Gessner, was robbed by four young black males.  I would tell the Court that the First National Bank that was robbed is, in fact, federally insured by the Federal Deposit Insurance Corporation.

> The bank robbers were later identified as Mr. Randle, Mr. Wilbourn, Mr. Washington and Mr. Thomas.

> Of the four individuals, Mr. Wilbourn, Mr. Washington and Mr. Thomas entered the bank and there were three bank employees that they directly addressed.  Mr. Wilbourn, Mr. Washington and Mr. Thomas were all each armed with a pistol.  Mr. Thomas approached one of the bank employees, Ms. Solis, who was standing in the lobby.  He pointed a pistol at her and ordered her to get to the ground.  Mr. Wilbourn approached another bank employee, Ms. Sanghui—the spelling is S-a-n-g-h-u-i- who

was seated at her desk in the lobby, pointed a pistol at her and instructed her to get to the ground.

Mr. Washington pointed a pistol at another employee, Ms. Watkins, who was working behind the teller counter, instructed her to open the door which leads from the lobby area to the vault room, as well as to the area behind the teller counter.

Mr. Wilbourn, Washington and Thomas ordered the employees to the vault room, where they demanded money. Each of the three threatened to shoot the employees if they did not hurry up and show them where the money was.

Mr. Thomas had assaulted Ms. Watkins by grabbing her hair. Mr. Wilbourn assaulted Ms. Watkins by grabbing her hair and striking her face.

Ms. Solis, fearing for her life, informed Mr. Wilbourn, Washington and Thomas that she had the money in her teller drawer. Ms. Solis gave her teller drawer key to Ms. Watkins, and Ms. Watkins and Mr. Thomas retrieved money from Ms. Solis' teller drawer.

Mr. Washington approached Ms. Solis, again pointing a pistol at her, and demanded to know where the rest of the money was. Ms. Watkins, fearing for her life, opened the vault, at which time Mr. Washington removed some money from the vault while Mr. Wilbourn and Mr. Thomas maintained control of the bank employees.

After obtaining the money [prior to] leaving the bank, Mr. Wilbourn and Mr. Thomas and Mr. Washington all threatened to shoot the bank employees if they moved. They left the bank, got in an older Cadillac and drove away. Part of the money had a tracking device in it. So law enforcement authorities [were] tracking the movement of the money, which of course was in the car – was tracking the movement of the money.

Another police officer heard the radio traffic about the bank robbery, that the tracking device was in the vicinity of where he was, and the car was believed to be an older Cadillac with four young black males in it in the vicinity where the tracking device had been radioed, this location which he heard over the radio. He turned around and got behind this Cadillac, which immediately then took off. And he followed–basically, the car sped away. He followed the car to an apartment complex located in the 9800 block of United Street in Houston. Upon pulling into the apartment complex, all four of the occupants jumped out and ran away.

This officer pursued the subjects as best he could. He lost sight of the subjects, but was informed by a witness at the apartment complex that Mr. Randle, or later identified as Mr. Randle, had jumped over a fence and was in a field adjacent to the apartment complex. This officer entered the field and found Mr. Randle hiding there, where he took him into custody, and Mr. Randle was identified as the person who

had been one of the persons who had ran away from the Cadillac when it pulled into the apartment complex.

Other HPD Officers arrived at the scene. They surrounded the apartment complex, were notified by a maintenance official at the apartment complex that there was a window recently broken out of an apartment, had just been broken out of an apartment.

The officers arrived at the apartment and entered the apartment, which was a two story apartment. Upon entering the apartment, the occupants of the apartment ran down the stairs from the second floor into the custody of the HPD officers. The occupants informed the officers that there ware two subjects upstairs in the residence who had broken into their residence.

Mr. Wilbourn and Mr. Washington began to walk down the stairs were they were met by the HPD officers. Then they ran back upstairs trying to avoid the officers. The officers followed and Mr. Wilbourn and Mr. Washington were taken into custody in the upstairs apartments where they had broken into.

The occupants of the residence advised the officers that Mr. Wilbourn and Mr. Washington had broke into their residence and made them remain in the upstairs bedroom while Mr. Wilbourn and Mr. Washington hid from law enforcement as best they could.

Mr. Thomas, he was found hiding in the storage closet within the same apartment complex and the officers found in his pockets some of the reported– money that had been reported as being stolen from the bank. Also found nearby him was a bag containing some of the money that had the tracking device in it right there where Mr. Thomas was found.

Mr. Wilbourn, Washington and Thomas were transported back to the bank, where they were separately viewed by bank employees. Mr. Wilbourn and Mr. Washington and Mr. Thomas were positively identified as being the three individuals who robbed the bank earlier that day.

Each of the individuals, Mr. Randle, Mr. Thomas, Mr. Wilbourn, and Mr. Washington, were all taken back to HPD offices, where [they] were all interviewed that day. With respect to Mr. Randle, he was read his *Miranda* warnings, he waived his warnings and agreed to be interviewed. During the course of the interview, Mr. Randle confessed to being the get-away driver, during the bank robbery, as well as one of the planners of the bank robbery, along with Mr. Thomas, Wilbourn and Washington. Mr. Randle said he was to receive a portion of the bank robbery proceeds for being the driver.

That same afternoon, Mr. Thomas was interviewed and likewise confessed.

On the same afternoon, Mr. Washington was interviewed.  He again was given his warnings.  He waived his rights and his warnings and agreed to be interviewed.

During the interview, he also confessed of participating in and planning and carrying out the bank robbery, along with Mr. Randle and Mr. Wilbourn and Mr. Thomas. Mr. Washington confessed to being in possession of a firearm during the commission of the bank robbery, and again, he also stated that, of course, he was going to receive a portion of the bank robbery proceeds.

The same afternoon about the same time, Mr. Wilbourn was interviewed by the HPD officers.  He was read his statutory warnings, which he waived, and agreed to speak to the officers.  He again, as the others confessed in participating in the planning, the execution of the bank robbery with his co-defendants, he also confessed to being in possession of a firearm during the commission of the bank robbery.  And Mr. Wilbourn confessed to physically assaulting one of the bank employees during the commission of the bank robbery.

The bank reported a loss to the officers of $40,312 and change, of which $35,577 was recovered at various locations.  For instance, about $19,750 was recovered in the apartment where the two defendants had fled and gone upstairs before they were caught by the officers.

Another $11,261 was found in the Cadillac where the defendants had fled from when they pulled into the apartment complex.

About $210 was found on Mr. Thomas himself and another $1,093 was found in a bag basically next to where Mr. Thomas was found and that was the money with the tracking device in it.

Inside the Cadillac were two of the pistols used during the bank robbery, both being, I believe, loaded 9 millimeter semi-automatic pistols, along with other items that were recovered, some of the clothing, and as I already mentioned, some of the money taken from the bank robbery.

Also recovered was the third pistol used in the bank robbery near or in the bag that was found near Mr. Thomas.  Also, I believe a 9 millimeter semi-automatic pistol.

There is money that has never been recovered, roughly I think $4800, have no idea where it was.  This was a short period of time from 9:00 bank robbery until everything was recovered.  The defendants were arrested within literally a few hours What happened to that other $4,800, frankly, we don't know. It's somewhere. Somebody has it, but we don't know where it is.

That's what the Government would be prepared to prove if the case went to trial, Your honor.  (Document No. 171, p. 25-32).

In response, Randle confirmed the accuracy of the summary and his role in the offense.  (Document No. 173, p. 33).

Prior to sentencing, a Pre-Sentence Investigation Report ("PSR") was prepared.  (Document No. 78 & 90).  The record shows that the Randle had a base offense level of 20 under U.S.S.G. § 2B3.1(a).  Because the property of First National Bank, a financial institution was taken, pursuant to U.S.S.G. §2B3.1(b)(1), his offense level was increased two levels.  Because a firearm was pointed at the head of bank employees as the employees were commanded to get to the ground, his base offense level was increased by six levels under U.S.S.G. § 2B3.1(b)(20(D).  Because a  victim sustained bodily injury, pursuant to U.S.S.G. § 2B3.1(b)(3)(A), his offense level was increased two levels.  Because bank employees were abducted, by being physically restrained and being forced, at gunpoint, to move from the lobby area to the vault area, pursuant to U.S.S.G. § 2B3.1(b)(4)(B), his offense level was increased by four levels.  Randle was held accountable for a loss amount of $40,213.50.  Pursuant to U.S.S.G.. § 2B3.1(b)(7)(B), his offense level was increased one level.  Because Randle accepted responsibility for his activities, and did so timely, his base offense level was reduced by three levels.  With an adjusted offense level of 32, and with a criminal history category of II[2], Randle had an advisory guideline sentencing range of 135 to 168 months.

While Randle filed no written objections to the PSR, he filed a Sentencing Memorandum. (Document No. 106).  With respect to the calculation of his advisory guideline sentencing range, Randle objected to the enhancements in PSR ¶ 24-27.  Based on Randle's calculation, with an

_____

[2] The PSR reveals that Randle had total of three criminal history points. Randle was assessed one point for a 2009 conviction for forgery in Fort Bend County, Texas.  Because Randle was under supervision of the Fort Bend County Community Supervision and Corrections Department at the time the instant offense was committed, pursuant to U.S.S.G. § 4A1.1(d) two points were added to his criminal history score.  Under U.S.S.G. Chapter 5, Part A, three criminal history points results in a criminal history category of II.

adjusted offense level of 19 and a criminal history of I, he had an advisory guideline range of 32 to 37 months. (Document No. 106, ¶ 4).

At Randle's July 7, 2011[3], sentencing hearing, Judge Harmon questioned Randle about whether he had read over the PSR, whether he had discussed the PSR with counsel, whether he had any questions about the report, and whether he had any objections to the PSR that he would like to voice. Randle confirmed that he had and stated that he had no objections he wished to voice. (Document No.209, p. 5-7). Judge Harmon sentenced Randle to a term of imprisonment of 135 months, to be followed by a four-year term of supervised release, and $4,735.00 in restitution. (Document No. 115, Transcript of Sentencing Hearing, Document No. 171, p. 119-121). In imposing a 135-month sentence, Judge Harmon stated:

> Kenneth Ray Randle has pled guilty to aiding and abetting armed bank robbery. He planned with the co-defendants to execute the robbery of the First National Bank, a financial institution in Houston, Texas. He waited outside the bank in a stolen vehicle while three co-defendants armed with firearms stole approximately $40,213.50 from the bank.
>
> During the robbery, a co-defendant struck a bank employee in the face, causing bodily injury. He's held accountable for the actions of his co-defendants, namely abducting the employees that were moved into the vault area of the bank, pursuant to United States Sentencing Guidelines Section 1B1.3, Relevant Conduct.
>
> The instant offense is Mr. Randle's second serious criminal conviction and he's under the supervision of the Fort Bend County Community Supervision and Corrections Department at this time, with his term expiring on May 7, 2014.
>
> In view of his previous convictions and in consideration of his status under the criminal justice sentence during the commission of the instant offense, a sentence at the bottom end of the Guideline range is appropriate for this sentence and will address the sentencing goals of punishment, the protection of the public and deterrence. Such a sentence is considered sufficient and necessary to comply with the purposes of the statutory sentencing framework of the provisions of 18 United States Code, Section 3553(a). (Document No. 171, p. 118-119).

---

[3] Randle's July 7, 2014, sentencing was continued to July 29, 2011. (Document No. 113, Transcript of Sentencing Hearing, Document No. 209).

Judgment was entered on August 10, 2011.  (Document No. 140).  Randle appealed his sentence to

the  Fifth Circuit Court of Appeals.  (Document No. 124).  On March 20, 2013, the Fifth Circuit

affirmed the Court's application of the four-level enhancement for abduction. (Document No. 227).

The Fifth Circuit wrote:

> Kenneth Ray Randle pled guilty to aiding and abetting an armed bank robbery.  He
> appeals the district court's within-guidelines sentence of 135 months imprisonment
> and four years supervised release.  He asserts that the district court erred in applying
> a four-level enhancement for abduction pursuant to U.S.S.G. § 2B3.1(b)(4)(A).  He
> contends that moving a bank employee from the lobby area to the vault area of the
> bank does not constitute abduction.  He adds that the enhancement should not apply
> unless "there is forced movement which creates a greater risk of harm to the victim
> than any conduct which would occur in the 'ordinary' course of a robbery . . .
> whether or not any victim is physically restrained at the robbery scene."
>
> Randle has not shown that the district court committed error, plain or otherwise, in
> applying the abduction enhancement in this case.  Consistent with our holding in the
> appeals of Randle's co-defendants, the district court was correct in applying the
> enhancement because the robbers forced the tellers to move at gunpoint from the
> teller area to the vault area, enabling the robbers to commit the offense.  *See United
> States v. Washington*, Nos. 11-20563, 11-20564, 11-20567, 2012 WL 6098021, at *5
> (5th Cir. Dec. 10, 2012)("The forced movement of a bank employee from one room
> of a bank to another– so long as it is in aid of commission of the offense or to
> facilitate escape–is sufficient to support the enhancement given the flexible approach
> we have adopted in this circuit."); *see also United States v. Johnson*, 619 F.3d 469,
> 472-74 (5th Cir. 2010)(finding there to be an abduction "even though the victim
> remained within a single building").

Randle did not file a petition for certiorari.  On or about March 21, 2014, Randle timely filed the

instant § 2255 motion (Document No. 244), and a few days later, a Memorandum in Support of his

§ 2255 motion.  (Document No. 246).  Randle argues that he was denied his constitutional right to

effective assistance of counsel at trial and on appeal.  The Government has answered and has moved

to dismiss Randle's § 2255 motion.  The Government maintains that neither trial counsel nor

appellate counsel were deficient and even assuming that Randle could show deficiency on the part

of either trial or appellate counsel, he has not and cannot show he was prejudiced by the alleged

deficiencies.

## II. Discussion

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id*. at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.  When ineffectiveness claims relate to counsel's performance at sentencing, as raised herein by

Randle, *Strickland's* deficiency prong is met when counsel fails to "research facts and law and raise meritorious arguments based on controlling precedent. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir.), *cert. denied*, 558 U.S. 914 (2009)(citing *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)).  In addition, "'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler v. Cooper*, ___U.S.___, 132 S.Ct. 1376, 1386 (2012)(quoting *United States v. Glover*, 531 U.S. 198, 203 (2001)).  Counsel is not required to "anticipate changes in law or raise meritless objections." *Fields*, 565 F.3d at 296.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.  The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984).  The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) discussed *Strickland* in the context of a habeas proceeding involving a state conviction. While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the

Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that "[t]here are, [ ] 'countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'  Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach."  *Id.*  at 788-89 (quoting from *Strickland*, 466 U.S. at 689).  As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that counsel formulated a strategy that was reasonable at the time and balanced limited resources with effective trial tactics and strategies.  *Harrington*, 131 S.Ct.  at 789.  "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."  *Harrington*, 131 S.Ct.  at 791.  Moreover, "it is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy."  *Harrington*, 131 S.Ct.  at 791 (emphasis added).  Finally, in considering the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just conceivable.  *Id.*  at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from *Padilla v.  Kentucky*, 559 U.S. 356, 371(2010)).  In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct.  at 778 (citations omitted).  The *Strickland* standard applies to ineffective

assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Randle claims that his trial counsel was ineffective for failing to request a severance for sentencing. According to Randle, his trial counsel had filed a severance motion when the matter was set for trial but "recklessly abandoned" the motion prior to sentencing. Randle argues that he was harmed by the "contamination" of being sentenced with his co-defendants. The docket sheet reveals that counsel had filed a Motion to Sever on December 9, 2010. (Document No. 49). At the time the motion was filed, the matter was set for a Pretrial Conference on January 7, 2011, and for trial on January 10, 2011. (Document No. 39). The motion became moot when Randle pleaded guilty on April 1, 2011. (Document No. 70). To the extent that he suggests that counsel could have and should have re-urged the motion to sever prior to sentencing because he was "contaminated" by his co-defendants, his ineffectiveness claim fails. In calculating a base offense level, the court considers "all 'relevant conduct" as defined in U.S.S.G. § 1B1.3." *United States v. Vital*, 68 F.3d 114, 117 (5th Cir. 1995). For purposes of sentencing, the relevant conduct included Randle and his co-defendants. Randle has not and cannot show that he was prejudiced by being sentenced with his co-defendants. The law is clear that the failure to make a frivolous or meritless objection cannot constitute ineffective assistance of counsel. Randle's counsel was not ineffective for failing to request the severance urged by Randle. *See Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007)(citing *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998)).

Next, Randle argues that trial counsel was ineffective for failing to object to enhancements not in the Indictment based on the Supreme Court decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, ___U.S. ___, 133 S.Ct. 2151 92013). In *Apprendi*, the Supreme Court held that any fact, other than the fact of a prior conviction, that increases the penalty of a crime *above the statutory maximum* must be found by a jury. *Apprendi*, 530 U.S. at 490. In

*Alleyne*, the Supreme Court held that any fact that increases a *mandatory minimum sentence* for a crime is an "element" of the crime, not a "sentencing factor," that must be found by a jury. *Alleyne*, 133 S.Ct. at 2155, 2158. Here, Randle's base offense level of 20 was increased by 15 levels based on the specific offense conduct. This included a two-level increase under U.S.S.G. § 2B3.1(b) because property of a financial institution was taken; a six-level increase under U.S.S.G. § 2B3.1(b)(2)(D) because a firearm was used in the offense ; a two-level increase under U.S.S.G. § 2B3.1(b)(3)(A) because a victim sustained bodily injury; a four- level increase under U.S.S.G. § 2B3.1(b)(4)(B) because the bank employees were abducted during the commission of the robbery; and a one-level increase under U.S.S.G. § 2B3.1(b)(7)(B) based on the loss amount. The enhancements did not increase a statutory maximum or mandatory minimum sentence. The maximum sentence for count one, aiding and abetting armed robbery, in violation of 18 U.S.C. §§ 2113(a) and (d), and 2 is not more than 25 years. Here, Randle's sentence of 135 months does not exceed the statutory maximum. And the offense carried no mandatory minimum sentence. As such, *Apprendi* and *Alleyne* did not apply and counsel was not ineffective for failing to make a meritless objection. Counsel has no duty to raise meritless claims. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994)(quoting *Smith v. Puckett*, 907 F.2d 581, 585 n. 6 (5th Cir. 1990)("Counsel is not deficient for, and prejudice does not issue from, failure to raise [on direct appeal] a legally meritless claim.").

Randle also alleges that trial counsel was ineffective for failing to object to the sentencing disparity between his sentence of 135 months on Count One and that of his co-defendant Wilbourn, who was sentenced to 97 months on Count One. This claim provides him no relief. The Indictment charged Randle in Count One only. Co-defendant Wilbourn was charged in both counts. Wilbourn was charged with aiding and abetting armed bank robbery in violation of 18 U.S.C. §§ 2113(a) &

(d), 2 (Count One), and with aiding and abetting the brandishing of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Count Two).  Count Two carried a seven year mandatory minimum sentence that runs consecutive to any other sentence imposed by the Court.  Thus Randle's sentence of 135 months is less than co-Defendant Wilbourn's total sentence of 181 months.  Counsel was not ineffective for failing to make a meritless objection.

Randle next alleges that counsel was constitutionally ineffective for failing to object to the sentencing enhancements.  According to Randle, counsel could have and should have argued that his role in the offense was not of the same caliber and character of the other defendants and that his role was limited to that of a lookout and get-away driver.   Randle maintains that had his counsel objected to the enhancements, his sentencing range would have been significantly lower.

Here, the facts do not support Randle's contention that trial counsel rendered ineffective assistance of counsel at sentencing by failing to object to the enhancements.  While counsel did not file written objections to the PSR (Document No. 87), the docket sheet shows that he filed a Memorandum in Aid of Sentencing and Motion for Sentence Below the Applicable Guideline Range and Request for a Variance (Document No. 106), in which counsel argued for an adjusted guideline range of 32 to 37 months and in particular, argued that the enhancements in PSR ¶ 24-27 should not be added to Randle's base offense level for purposes of calculating Randle's advisory guideline sentence.  Specifically, the enhancements that counsel argued should not be included in calculating Randle's adjusted offense level were a six level increase under U.S.S.G. § 2B3.1(b)(2)(D); a two level increase under U.S.S.G. § 2B3.1(b)(3)(A); a four level increase under U.S.S.G. § 2B3.1(b)(4)(B); and a one level increase  under U.S.S.G. § 2B3.1(b)(7)(B).

Moreover, the  transcripts of the July 7, 2011, and July 29, 2011, Sentencing Hearing (Document Nos. 171, 209) show the counsel joined the objections to the enhancements raised by

Randle's co-defendants, which were based on relevant conduct and applied to all. For example,

with respect to the one- level enhancement for loss amount, counsel stated:

> Mr. Jones: We did not so state in our objections to the presentence report, Your Honor. However, in asking for a variance, we did direct the Court to another means of achieving the same thing; and we could adopt those objections here at this time orally.

> The Court: All right. (Document No. 209, p. 9).

Trial counsel also joined the objections to the four-level abduction enhancement.

> Mr. Jones: Your Honor, we have no specific objection to the four-level enhancement; however, in our sentencing memorandum we sought to reach the same conclusion and substance as would relate to Mr. Randle and his participation in this offense. And, so, therefore, we would have no objections to that, since we hope to get to that point in a different manner. (Document No. 209, p. 13).

*        *        *

> Mr. Jones: Your Honor, if the Court will recall, we stated that we had no objections to the presentence report. However, we did direct the Court's attention in our sentencing memorandum under 3553(a) how we believe that the guideline range that was reached by the probation would be inappropriate and incorrect as to our client— as to my client, insofar as the plus six as relative to the firearm, the plus two where there was bodily injury, since we were not in the bank. And those things would relate to our being in the bank or doing something that would amount to bodily injury. I think the probation reflected that it may be appropriate for a — for the Court to consider whether or not we were a major participant in planning. However, I would address that in allocution.

> And there's also an instance where it talks about the amount of money that was taken. We never had possession of any money. And it included some information concerning the theft of a vehicle. And I think there's just no evidence that we stole the van or was present when the van was stolen. I think that conclusion was incorrect, which I will address in allocution.

> But as to objections of the other defendants as far as they would relate to relevant conduct, because if that be not true, then certainly how our offense level was arrived at could be incorrect. (Document No. 209, p. 39-40).

The Government responded as follows to trial counsel's arguments as follows:

> Mr. Schultz: Well, with respect to Mr. Randle, whatever the Court's rulings are on

the other defendants' objections, whether abduction, amount of money, bodily injury, whatever the other objections are for the three defendants that were in the bank, however the Court rules on those objections, and it has already ruled on some of them, those enhancements as applicable to those three defendants would, of course, be applicable to Mr. Randle via relevant conduct. So, I think that the enhancements as applicable in the PSR to Mr. Randle are appropriate given the Court's rulings so far.

One other thing I really want to point out about Mr. Randle that really hasn't been discussed too much in the facts of the case or in the PSR, is that Mr. Randle had a – everybody knows Mr. Randle as the driver. Okay. That's the easy part. But there's another role that Mr. Randle had that certainly was not the role that the three who entered the bank had, and that was, if the Court recalls in the PSR and in the facts of the case, Mr. Randle was on the phone at all times with one of the other defendants as the look out. So, he wasn't just merely a driver. He did have a specific role, to help the defendants in the bank get on with the bank robbery. And as I said, he was on the phone. And I forget which of the other three he was on the phone with, but at all times — or pretty much all times during the bank robbery, Mr. Randle was in contact with one of the robbers in the bank to let them know, hey, the cops aren't coming or whatever they were talking about. But as part of the bank robbery, he had another role besides just as a, quote, unquote, mere driver. So, I don't want the Court to believe that he had no other role besides just being sort of an uninformed driver as to what was going on inside.

Mr. Jones: Your Honor, I think that is probably a leap as to what conversations were being had. I don't think anybody gave any information that there were, in fact, a conversation being had at any time. I think that the offense report reflects that he wasn't even left in the driver's seat when they went inside the bank. And certainly he pled guilty because he participated and he talked about his participation. And I think even at one point he mentioned, "Look, don't hurt anybody." Not to say that that had any overriding effect on anything that went on in the bank, but it shows his frame of mind, his mental state during the offense. And I think that one could guess that could have been the conversation had there been a conversation, but there's nothing to reflect that there was a conversation, although there is information that he did have a phone, that he did sit in the car, and there's nothing to say to he gave any instructions to anybody while they were in the bank. That was probably one of the safeguards that they gave him. And in light of what did happen, probably if the police had come, he would have pulled off and not even been there. But then, again, that's conjecture.

Mr. Schultz: And I would agree with Mr. Jones, that we don't know that the conversation was. My point is, is that he was on the phone with one of the defendants while the robbery was going on through much of the robbery.

Just as actually Mr. Wilbourn had a little bit of another role that the other defendants

didn't have, and that was, once the bank robbery was completed and they left in the stolen van, Mr. Wilbourn provided his own car as, in effect, the ultimate getaway vehicle, the final getaway vehicle, if you will.  He provided the Cadillac for which everybody got out of the van, got into the Cadillac, and then they left in the Cadillac and then were followed by the police officer and ultimately that car was, of course, abandoned when they jumped out of the apartment complex.  So, Mr. Wilbourn had somewhat of an additional role besides just being one of the robbers that went into the bank.  He provided the final getaway car.  (Document No. 209, p. 40-43).

The record further reflects that at the July 29, 2011, continuation of the Sentencing Hearing,

trial counsel argued that Randle's role in the offense was not the same as his co-defendants who were

physically present in the bank.

Mr. Jones:  Only in brief, Judge.  I think maybe Mr. Schultz misspoke when he said that what he has will have each of the defendants doing something inside of the bank. I think it is to the exclusion of Mr Randle.

Mr. Schultz:  Oh, absolutely.

The Court:  Yes.

Mr. Schultz:  Mr. Randle never went in the bank.

The Court:  Right.

Mr. Jones:  And certainly, though we concede to relevant conduct, we would certainly like the opportunity to talk about foreseeability and things of that sort. (Document No. 171, p. 9-10).

The record shows that trial counsel adopted the objections raised by Randle's co-defendants

to the  two-level bodily injury enhancement.

Mr. Jones.  And, Your Honor, I am compelled to adopt the objections from the other learned counsel based on the theory of relevant conduct.  (Document No. 171, p. 69).

Lastly, the record reflects that trial counsel argued for a lower sentence:

Mr. Jones:  We would adopt the statements of other counsel as far as they relate to things that would be relevant to Mr. Randle.  We believe that in looking at the Guidelines calculations, when considering how Probation came up with the numbers that they did relative to Mr. Randle, he is punished for not going into the bank with

a gun.

I think that as far as allocution is concerned, it would appear that what you have is the youngest of the group, 23 years old, the least as far as criminal history, a person who drove the vehicle to a place and then ran into a field after they were followed by the police, who didn't have any money, who didn't have a gun, who apparently had said, prior to going into the bank, it was uncontroverted, "Don't hurt anybody." And that's whether it is a major injury, a minor injury.

The dilemma is that a 23- year-old, with the kind of background that he had, has not reached a point of maturity that he doesn't even realize that, first of all, it may be a hollow statement to say, "Don't hurt anybody" when somebody has a gun. The maturity is shown by this statement. However, there is nothing to indicate that he was not, in fact, very sincere and showed fear and fright throughout this whole thing.

The interesting thing is that you have people who have put themselves together to commit an act. And admittedly, he says he agreed to it, he participated in it, he was a part of it. However, you have people who don't even know each other. He knows Mr. Thomas because he's is barber. Mr. Thomas is older than him. Sometimes, somebody who has had experiences that were negative should at least separate people who have not had negative experiences. That's usually because they know each other and people protect each other from harm. This group was loosely put together as far as it would relate to relevant conduct.

Foreseeability. You can't see what people are born to if you don't know. And that is the dilemma here. And so the things that were happening inside of this bank, it is questionable as to whether or not one person was foreseeing what the other person was doing, or that one person agreed.

At least we know that Mr. Thomas said, "Don't hurt anybody." And sometimes being hurtful is just cursing somebody or being negative or making someone afraid.

It would appear that the Sentencing Guidelines being advisory, that this is the kind of case where the Court can use its judgment and can use its discretion in making sure that the sentence fits the conduct of the person.

In the number of letters that Mr. Randle has, there appears to be one letter that was written that says that he has been trying to participate with this nonprofit involving talking to juveniles. There is so much that he could do that would be positive to avert the kind – or at least prevent the kind of conduct that these defendants have engaged in; that since his arrest, he has been on bond and he has been able to fulfill all the conditions of release. He has been able to get a job.

His family, at the time of this, he was living with his grandmother. His family was nearly destroyed. His father, who's not his birth father, there arose some such

conflict in the family. His grandfather died. And things that made him open his eyes as to where he was and where he could possibly go and where he could end up probably almost half of what his life has already been.

The Guidelines being advisory — what we do know is that he didn't have a gun in the car. There weren't four weapons; that he never possessed the gun, he never supplied anybody with a gun. So that, in and of itself, in Paragraph 24 of the Presentence Report, should negate the plus six under relevant conduct if we were just trying to see if there is basis for a variance as it would relate to him.

That is being foreseeable to him that a victim would be harmed, either their hair would be pulled or something of that nature– which could be minor inside of the bank, but would be major outside of the bank, as far as knowing that someone had done this–that the plus 2 in Paragraph 25, as far as a variance, should not be applied.

And that in Paragraph 26 of the Presentence Report, where it is indicated that someone was abducted, certainly, if he had indicated "Don't hurt anybody," then that would have included an abduction. And the plus 4 that he is held accountable, and which carries the Guideline range to be greater than anyone else, though the evidence would tend to show that he was the least culpable as far as the conduct that was occurring inside of the bank, as far as knowing that — we believe that the amount has been addressed as far as the loss and the plus one. And one, if not all of the defendants have had a Guideline calculation based upon less than that.

Right now he is look looking at — if those things were excluded, he would be — with a Criminal History of 1, he would look at a Level 19, which should be his appropriate Guideline calculation, with the possibility of a variance from that.

I believe that there is such a great opportunity for him to make a positive impact on society, and it has also been displayed by the conduct since the time of his arrest, and to show that he is a person who is redeemable without a long period of incarceration.

We believe that based upon the matters that have been brought out in our Sentencing Memorandum, that his Guideline range should be consistent with a person who did not enter a bank, who did not possess a firearm, who did not injure or abduct anyone, because that is the facts. That is what happened and that is undisputed.

There was something in the Presentence Report that reflected on the probability that they were all together when the vehicle was stolen. I think that that is probably not the truth, that there were only two people who stole the vehicle. That is memorialized in one of the videos and not in the offense report itself. And I have spoken with Probation, and their attitude is that could likely be an attitude that what had previously been said to be basis for an upward departure may not exist.

We're requesting that the Court consider the fact that incarceration should not be the

basis for rehabilitation, that each of these persons were impaired from this– or at least the night before, when this offense occur, because they were all smoking marijuana by their statements to officers.  And that taking that into account, that there have been ample reasons that his youthfulness or the fact that his statute is probably the least of everybody, and the things that we brought out in Sentencing Memorandum relative to the kind of impact that incarceration would have on a person of his size and his maturity, his lack of maturity.

We have here today in the audience his grandmother, his mother, his father, his brother, his employer, his cousin, his aunt, his uncle, and a family friend who's like an aunt, Ms. Dixon, and all of these people have written letters.  We have Rodney Baker, his uncle, and Sharon Baker, his aunt.  We have also a person who's a friend like an aunt, Ms. Ellison, and his other aunt, Ms. Prince.  These are people who are willing to be a part of his life and have been a part of his life.  And now that they know that there are certain things that are aberrations relative to him — and this could be considered as aberrant conduct on his part— he has a place to go, he has people who love him, he has people who are willing to assist him and people who are willing to share the story of what has happened at this courthouse and what can happen to a young man.

And I believe that they indicate– and I know they indicate in their letters that they each notice changes in him.  The fact that this has been a jolting thing in his life and has helped him to get back more to the center and understand the things that are required of him if he intends to be an appropriate citizen in this society.

And for those reasons and others and I think he will relate in his allocution, Judge, we're asking that the Court give Mr. Randle a variance and that the Guidelines calculations, as they are set out, would be Draconian as they were drawn.  (Document No. 171, p. 83-89).

Upon this record, the transcript of the Sentencing Hearing and Sentencing Memorandum undermine Randle's claim that he was prejudiced by trial counsel's failure to file written objections to the PSR and failure to object to the sentencing enhancements.  The record shows counsel objected to the enhancements. The totality of the record refutes Randle's suggestion that trial counsel failed to prepare for sentence and that he was prejudiced by counsel's performance at sentencing.  As for Randle's suggestion that trial counsel failed to thoroughly investigate both the facts and laws applicable to the plausible objections, the record shows trial counsel's familiarity with the information in the PSR, the Sentencing Guidelines, and that the relevant conduct of Randle's co-

defendants would be imputed to him.  The record shows that trial counsel vigorously argued for a lower sentence of 32 to 37 months.  *See Riedle v. United States*, Civil No. 4:09-CV-394-Y, Criminal No. 4:07-CR-076-Y, 2010 WL 610728, at *4 (N.D.Tex. Feb. 22, 2010)(rejecting ineffective assistance claim where counsel made potentially meritorious objections at sentencing hearing and made energetic efforts to lower petitioner's sentence).  This claim fails.

Randle also alleges that appeals counsel was ineffective for filing an *Anders v. California*, 386 U.S. 738, 744 (1967) brief.[4]  Randle points to the Fifth Circuit's request that counsel supplement the record by addressing the four-level sentencing enhancement for abduction under U.S.S.G. §2B3.1(b)(4)(A) as establishing that counsel had been negligent in filing an *Anders* brief.  There is nothing to suggest that counsel's decision to file an *Anders* brief was improper or that he was prejudiced.  The law is clear that the filing of an *Anders* brief does not constitute ineffective assistance of counsel.  Moreover, the fact that the Fifth Circuit, after an independent review of the review, requested that counsel supplement the *Anders* brief by addressing the abduction enhancement does not support a claim of ineffective assistance of appellate counsel.  Counsel did raise and fully brief the abduction enhancement and the issue was considered by the Fifth Circuit.  The Fifth Circuit, relying on its decision in the appeal by Randle's co-defendants affirmed the four-level abduction enhancement and Randle's sentence.  Randle's allegation that appellate counsel did not review the record or analyze possible other enhancements for appeal or the calculation of his criminal history is wholly conclusory and he fails to assert any facts in support of his argument.

In conclusion, Randle has offered no proof of how either trial counsel or appellate's counsel's performance was objectively deficient, and no proof that such deficient performance prejudiced him

---

[4] *Anders* set forth standards for a court-appointed attorney who seeks to withdraw from a case on the ground that the appeal lacks an issue of arguable merit.

in any way.  *See Strickland*, 466 U.S. at 687.  Thus no relief is available under § 2255 of Randle's ineffective assistance of counsel claims..

## III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss Movant's § 2255 Motion (Document No. 267) be GRANTED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 30th  day of January, 2015.

Frances H. Stacy
United States Magistrate Judge